THE PEOPLE *ex rel.* GUADALUPE MENDEZ, on Behalf of Raquel Mendez, a Minor, Plaintiffs-Appellees, v. RAFAEL VILLA, Defendant-Appellant.

First District (2nd Division)    No. 1—92—2809

Opinion filed April 5, 1994.

Rita A. Fry, Public Defender, of Chicago (Vicki Rogers, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Robert F. Lyons and Leonard N. Foster, Assistant State's Attorneys, of counsel), for appellees.

JUSTICE SCARIANO delivered the opinion of the court:

On February 20, 1991, relator Guadalupe Mendez, on behalf of her daughter Raquel, filed a complaint to determine the existence of a father and child relationship between Raquel and defendant Rafael Villa. Relator alleged that she and defendant had engaged in sexual intercourse on a few occasions during the months of December 1979 and January 1980, as a result of which she became pregnant with Raquel, who was born approximately nine months later on September 7, 1980. She sought a declaration that defendant was Raquel's natural father and, *inter alia,* that he be ordered to pay child support for her, retroactive to the date of her birth.

Pursuant to section 11 of the Illinois Parentage Act of 1984 (750 ILCS 45/11 (West 1992) (formerly Ill. Rev. Stat. 1991, ch. 40, par. 2511)), the parties submitted blood samples in order that appropriate blood and genetic comparison paternity tests be conducted by Genetic Design, Inc., of Greensboro, North Carolina. The test results disclosed that defendant could not be excluded as the father of Raquel, and that he was, in fact, 99.99% likely to be her father. The results also showed that defendant's combined paternity index (CPI), which, as described by relator's expert, Dr. Christine Durkie, is a

statistical compilation of the results of three different types of genetic tests, was 6,789 to 1. According to Durkie, that figure predicted that defendant was 6,789 times more likely to be the father of Raquel than any randomly chosen male who would qualify as a member of the population group defined as Hispanic. Because the CPI was in excess of the statutory minimum of 500 to 1, defendant's paternity of Raquel was to be presumed and could be rebutted only by clear and convincing evidence demonstrating that he was not her father.[1]

Defendant, called as an adverse witness, admitted to having sexual relations with Guadalupe Mendez, sometime around January or February 1980. He also affirmed that he had previously met Raquel, the first time being when she was very young. Some years later, he saw Raquel at his father's funeral, at which time he gave her a chain which had been either his father's or his ex-wife's, and a charm in the shape of a bull, which represented Taurus, the sign of the zodiac under which she was born.

After the funeral, Raquel accompanied him to his home, where his relatives had gathered. He denied introducing Raquel as his daughter to the group assembled, but instead recalled introducing her simply as Raquel. Before the paternity action was filed, he had last seen her when she spent a few nights at his home during her Christmas vacation, at which time he again gave her presents. He denied telling Raquel that he was her father and further denied that he had ever heard Raquel refer to his sisters as "aunt" or his mother as "grandma." Finally, he had no recollection of his ever having spoken to Raquel concerning the changing of her surname from Mendez to Villa.

In cross-examination and during his testimony after relator had

---

[1]The section in question provides in pertinent part:
"§ 11 Blood Tests. (a) As soon as practicable, the court *** may, and upon request of a party shall, order *** the mother, child and alleged father to submit to appropriate tests to determine inherited characteristics, including, but not limited to, blood types and genetic markers such as those found by Human Leucocyte Antigen (HLA) tests. ***

* * *

(f) Tests taken pursuant to this Section shall have the following effect:

* * *

(4) If the blood or tissue tests show that the alleged father is not excluded and the combined paternity index is at least 500 to 1, the alleged father is presumed to be the father, and this evidence shall be admitted. This presumption may be rebutted by clear and convincing evidence." 750 ILCS 45/11 (West 1992) (formerly Ill. Rev. Stat. 1991, ch. 40, par. 2511).

rested, he explained that he met Guadalupe through his sister, Linda Tanaschuk, with whom Lupe had a close relationship. It was Linda who informed him that Raquel had been born. In the year before the filing of the paternity suit, he and his sister were at odds over his decision to take their mother out of a nursing home, and also because Linda blamed him for impregnating her friend Guadalupe. He explained that this friction caused him to give the child presents, in the hope that it would appease his sister.

Guadalupe testified that she had four children, three of whom were fathered by her estranged husband, Abel Mendez. She and Abel were divorced in May 1979, the year before Raquel was born. She stated that she met defendant through her cousin and that their relationship was very brief, during which they twice engaged in sexual intercourse. When she skipped her next menses, she called defendant, predicting that she was pregnant, and told him she was contemplating abortion, to which he was unresponsive. She later decided to carry the baby to term.

When Raquel was born, Guadalupe listed Abel as her father on the birth certificate because, according to her, she was informed that in order to name defendant as the father, she had to have him sign the form, and at that time she was unaware of his whereabouts. Abel later testified that he could not have been the biological father of Raquel, and that he did not give Guadalupe permission to name him as the father on Raquel's birth certificate.

Raquel also testified, to which defendant objected on the ground of prejudice, and she related a conversation she had with defendant at his father's funeral, during which he took her aside and confessed that he was her father. When she was at his home during her Christmas vacation, he gave her presents, and at one point, the two discussed her desire to change her last name to Villa.

The jury found defendant to be the father of Raquel and judgment was entered thereon, from which defendant filed his timely notice of appeal.

I

■ Defendant first argues that the court erred in allowing relator to offer the testimony of Raquel. Defendant had moved *in limine* to exclude her testimony, urging that it would be overly prejudicial with little probative value. The court agreed in principle, but expressly reserved reconsideration of the issue in the event defendant denied that he told her he was her father. When, during his testimony as an adverse witness, he did deny making that purported admission to Raquel, the court, pursuant to its reservation of ruling,

allowed her to take the stand, and, as previously noted, Raquel testified that defendant admitted to her on the day of his father's funeral that he was her father. Defendant maintains that this was inadmissible in rebuttal and the court therefore erred in allowing it.

Evidence offered in rebuttal is admissible if it tends to explain, repel, contradict or disprove the testimony of a witness. (*Hoem v. Zia* (1992), 239 Ill. App. 3d 601, 606 N.E.2d 818; *Flanagan v. Redondo* (1991), 231 Ill. App. 3d 956, 595 N.E.2d 1077.) Its admission, as with the admission of all evidence, is addressed to the discretion of the trial court, which will not be disturbed unless it is manifestly erroneous. (*Lee v. Ingalls Memorial Hospital* (1992), 238 Ill. App. 3d 154, 606 N.E.2d 160; *Knight v. Haydary* (1992), 223 Ill. App. 3d 564, 585 N.E.2d 243.) An example of an abuse of the court's discretion pertinent to the instant appeal would be the court's allowing rebuttal testimony which has value only to contradict the defendant's testimony on an issue which is collateral to the action. (See *Hall v. Northwestern University Medical Clinics* (1987), 152 Ill. App. 3d 716, 504 N.E.2d 781; *People v. McGhee* (1974), 20 Ill. App. 3d 915, 314 N.E.2d 313.) Defendant argues, without explanation, that that is the case here.

An issue is considered collateral to an action if it has no relevance to a matter of consequence in the action as defined by the pleadings. (See *Tzystuck v. Chicago Transit Authority* (1988), 124 Ill. 2d 226, 529 N.E.2d 525 (reports concerning the repair of bus' dents from previous accidents is collateral to the issue of the defendant's liability for a later accident).) A fact is considered relevant if it has any tendency to make a material fact more probable than not. *Bullard v. Barnes* (1984), 102 Ill. 2d 505, 468 N.E.2d 1228; *Lundquist v. Nickels* (1992), 238 Ill. App. 3d 410, 605 N.E.2d 1373.

In light of these definitions, it cannot be gainsaid that the testimony of Raquel was relevant to the case and that it therefore was not collateral. The gist of her testimony was that defendant had confessed to her in private that he was her father. If believed, this evidence alone would resolve the matter at hand, *i.e.*, whether defendant was her biological father. Accordingly, the circuit court did not err in allowing Raquel's testimony.

## II

Defendant's final assignment of error concerns the definition instruction the court gave the jury explaining the quantum of proof required of defendant in order to establish that he was not Raquel's father before the presumption of his paternity, created by the greater than 500 to 1 CPI, would be rebutted. In the non-Illinois Pattern

Jury Instruction tendered by relator, the court admonished that "clear and convincing evidence," the standard imposed by the Act, "means that no reasonable doubt exists."

In *In re Estate of Casey* (1987), 155 Ill. App. 3d 116, 507 N.E.2d 962, this court held it to be error to charge a jury with that definition of clear and convincing evidence. The court reasoned that because it was likely that many jurors would be familiar with that standard from prior service in criminal trials, such a definition in a civil context could mislead a jury into tying it to the higher standard of proof obtaining in a criminal setting and would substantially disadvantage a party in a civil trial who was required to prove his case by clear and convincing evidence by systemically yet unintentionally increasing his burden of proof. As in *Casey*, the instruction given here certainly could have confused or misinformed the jury; thus, under Supreme Court Rule 239 (134 Ill. 2d R. 239), it was error for the court to give it. Therefore, due to the nature of the error, we must reverse the judgment and remand the action for a new trial.

In so doing, we are not unmindful that although the *Casey* court found the instruction defining "clear and convincing evidence" to be erroneous, it nevertheless affirmed the judgment because it found the giving of the instruction to be harmless. We reverse and remand in the instant case, however, because we part company with *Casey* on the issue of the amenability of the instruction at issue to harmless error analysis. (See *Rikard v. Dover Elevator Co.* (1984), 126 Ill. App. 3d 438, 441, 467 N.E.2d 386, 388 ("[I]t is essential that jurors receive a definition or description of the applicable burden of proof").) A trial judge's misdescription of the proper burden of proof is resistant to mending on appeal because the verdict it produces presents to the reviewing court not correctable findings of facts, but rather, because they were made through an improper optic, what must be deemed to be no findings at all.

Consequently, in this context for us to engage in a *de novo* review of the record to determine whether it contains sufficient evidence to rebut the statutory presumption of paternity would constitute an original assessment of the evidence by this court. Such a review would deprive defendant of his right to have a jury determine whether he is the father of Raquel, and would instead leave him only with our speculation and conjecture of his paternity.

In *Sullivan v. Louisiana* (1993), 508 U.S. 275, 124 L. Ed. 2d 182, 113 S. Ct. 2078, the Court reached this precise conclusion with respect to the mistaken definition of the burden of proof in a criminal trial. It held that a faulty explanation of the "proof beyond a reasonable doubt" standard constituted *per se* reversible error. (But *cf.*

872

*People v. King* (1993), 248 Ill. App. 3d 253, 618 N.E.2d 709 (holding that where no instruction on the State's burden of proof in a criminal trial is given, reversal is not required so long as the jury learned of the proper burden from, *inter alia*, the closing argument of the State).) We view *Sullivan*, although discussing a different burden of proof, as being fully analogous to the case at bar. Accordingly, we reverse the judgment of the circuit court and remand for a new trial to determine defendant's paternity of Raquel.

Reversed and remanded for a new trial.

DiVITO, P.J., and McCORMICK, J., concur.